Mitchell Madden
State Bar No. 12789350
The Law Offices of Mitchell Madden
1755 Wittington Place, Suite 300
Dallas, Texas 75234
Telephone: (972) 484-7780
Facsimile:  (972) 484-7743

**ATTORNEYS FOR STEVEN THRASHER,**
**individually and derivatively on behalf of**
**WHITE NILE SOFTWARE, INC.**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## SHERMAN DIVISION

| | |
|---|---|
| In re: | **PENDING IN THE UNITED STATES BANKRUPTCY COURT FOR THE EASTERN DISTRICT OF TEXAS** |
| EDWARD MANDEL (-0657)<br>5653 Monterey Drive<br>Frisco, Texas 75034 | |
| Debtor | CASE NO. 10-40219<br><br>Chapter 11 |

| | |
|---|---|
| STEVEN THRASHER, Individually and on behalf of WHITE NILE SOFTWARE, INC., | |
| Plaintiff | |
| v. | ADVERSARY NO. _____ |
| EDWARD MANDEL, | |
| Defendant | |

### COMPLAINT SEEKING DECLARATORY RELIEF

**TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:**

 **COMES NOW,** Steven Thrasher, individually ("Thrasher") and on behalf of White Nile

Software, Inc. as its representative shareholder and on behalf of those similarly situated

(hereinafter "WN Derivative")(sometimes collectively "T/WND"), and files this Complaint

pursuant to Section 541(d) of the Bankruptcy Code, 11 U.S.C. § 541(d), and Bankruptcy Rule

7001 (2) and (9), Fed R. Bankr. P., and in support would respectfully show the Court as follows:

## JURISDICTION

1.      This Court has jurisdiction over this subject matter of this Complaint pursuant to 28

U.S.C. §157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. §157(b)(2)(A) and (O).

Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicate

for the relief requested herein is 11 U.S.C. §541(d).

2.      Edward Mandel is the debtor and a Debtor–in–Possession in Case Number 10-

40219 ("Mandel" but sometimes referred to as the "Debtor").  The Debtor may be served by first

class mail, postage prepaid, by mailing a copy of the summons and complaint to his dwelling

house or usual place of abode which is 5653 Monterey Drive, Frisco, Texas 75034.  Moreover,

per Rule 7004 (g), service will also be made upon the Debtor's attorney, Richard Levy, at 17304

Preston Road, Suite 800, P.O. Box 796935, Dallas, Texas 75225 by regular mail as well as a

courtesy copy to same by e-mail.

## GENERAL NATURE OF RELIEF SOUGHT

3.      In general, T/WND seek, among other things, a declaratory judgment that the

shares listed in the Debtor's schedules of: a) Nexplore Corporation ("Nexplore"); and b) White

Nile Software, Inc. ("WNS") (collectively, the "Affected Shares") are not property of the

Debtor's estate under Section 541(d) of the Bankrupty Code.  T/WND will show that the Debtor

holds no equitable interest in the Affected Shares because Thrasher with regard to WNS, and/or

Thrasher or WNS with regard to Nexplore, are the beneficiaries of a constructive trust with

regard to the Affected Shares under otherwise applicable Texas law.  In this regard, the facts

specifically set forth below, and the evidence will show: 1) the Debtor committed common law

fraud; 2) the Debtor breached his fiduciary relationship or duty with regard to Thrasher and WNS; 3) The Debtor committed unconscionable conduct by civil theft, conversion and/or misappropriation of trade secrets belonging to Thrasher and/or WNS; 4) the Debtor was unjustly enriched by his fraud, breach of fiduciary duty and/or unconscionable conduct; and 5) that the Affected Shares issued to the Debtor by WNS and by Nexplore are an identifiable and traceable res resulting from the alleged misconduct on the part of the Debtor.

## FACTS

*White Nile Formation*

4.       Thrasher, prior to April of 2005, formed a friendship with the Debtor arising out of Thrasher's prior representation of an entity with which the Debtor was affiliated.  During the course of their acquaintance, Thrasher became aware of the Debtor's general business background and familiarity with his operation of software and software development companies and, in turn, Mandel became familiar with Thrasher's expertise with respect to intellectual property matters and, in particular, intellectual property matters and concepts related to computer software development, design and protection, and the internet.

5.       In or about April of 2005, as a result of this prior relationship, Thrasher approached the Debtor with respect to certain internet technology which he had developed. Because of the highly competitive nature of the software business and, in particular, internet software development, before discussing in any great detail; the concepts, thoughts and ideas he had developed, Thrasher requested and the Debtor executed a Non-Disclosure and Non-Use Agreement for Confidential and Proprietary Information effective as of May 25, 2005.  (attached hereto as **Exhibit "A"**) (the "ACPI").

6.      After seeing the concept, the Debtor immediately recognized the value of the proposal and ultimately agreed to partner with Thrasher in the development of the Intellectual Property and creation of a business vehicle and structure to exploit that intellectual property.  For his part, the Debtor represented that he had the contacts and expertise to either retain or put together a software development team and had sufficient financial resources, or access to same, to provide the initial funding for the software development and the startup of an entity.

7.      In furtherance of these representations, the Debtor identified and introduced Thrasher to Meaningful Data Solutions ("MDS") as the company to provide the initial software, design and support.  The Debtor represented to Thrasher that he would pay MDS's fees as his financial contribution to the initial funding.  The introduction and meetings occurred about the time that Thrasher, as the sole inventor, filed a provisional patent with the United States Patent and Trademark office regarding his invention.[1]

8.      Also during this time, in early July of 2005,  in furtherance of their agreement with respect to the internet project, the Debtor retained counsel to form a corporation.  Pursuant to the joint venture agreement between the Debtor and Thrasher, this corporation was to be

---

[1]Hereafter the trade secrets, concepts, designs and ideas referred to in the provisional patent application, or subsequent applications and all ideas and information derivative thereof are referred to as the "Intellectual Property." The Intellectual includes generally, an internet search engine including a graphical user interface designed to allow the user to graphically interact with search terms, suggestions generated by the search engine, search results, and advertisements.  It also utilizes "theme" groups and segments that network social, business, and other groups of users, and then learns the preferences of network members to better provide search results, user tools, and advertising. The advertising platform pushes advertising in a graphically based format and allows advertisers to more easily plan, test, and conduct advertising campaigns.  The Intellectual Property also includes designer models and tool kits to allow unaffiliated individuals to customize graphics, search algorythm, and other system aspects, and to profit from their modifications.   Other Intellectual Property includes graphically driven email and operating system tools.  Intellectual Property includes trade secrets. Trade secrets include, but are not limited to, any processes, plans, formulas, or other information, including business plans, work schedules, budgets, task lists, forecasts, technology plans, intellectual plans, investor presentations, trademark plans, executive summaries, investor lists, contracts, vendor agreements, supplier agreements, and the like.

jointly owned and jointly controlled by them.  For example, it was contemplated that the stock ownership initially would be 50/50 and that they would be the two sole initial directors.

9.      Articles of Incorporation for WNS were filed with Texas Secretary of State on July 13, 2005.  WNS was to be the corporate vehicle through which Thrasher and the Debtor would further develop the Intellectual Property (principally the search engine) invented by Thrasher.

10.      In the meantime, Thrasher continued work on the further development of the Intellectual Property, including work on a second provisional patent that was completed on or about August 29, 2005.  During this time period the Debtor approached Thrasher with an alternative to MDS as a software development provider.  The Debtor represented to Thrasher the existence of an investor located in the Philippines and the existence of a team of developers, including Ph.D.s, in the Philippines to provide the necessary software development.

11.      In reliance upon these continued representations by the Debtor, and the overarching agreement between Thrasher and the Debtor with respect to the development of the Intellectual Property as evidenced by ACPI, Thrasher continued to develop confidential and proprietary trade secrets which were derivative of, or in furtherance of, the provisional patents he had filed as sole inventor.  In addition, in reliance upon the ACPI representations, and in reliance upon the Debtor's execution of additional agreements with respect to the confidentiality of the project and the Intellectual Property with White Nile,[2] Thrasher also executed an Assignment of the initial provisional patents in favor of White Nile.  (attached hereto as **Exhibit "B"**)  The Assignment contained provisions under which the provisional patents would revert from White

---

[2]See for example, the Consulting Agreement attached hereto as **Exhibit "C".**

Nile to Thrasher.  The Assignment was reviewed by Kathy Cleveland, an attorney retained by the Debtor, on behalf of WNS and the Debtor.

12.    As of October 1, 2005, WNS hired Jason Coleman as a consultant to be the Chief Creative Officer.  He was to be responsible for preparing the front-end, i.e. the interface with the user, for WNS's internet project.  Also during this time, Thrasher contacted Paul Williams (who unbeknownst to him at the time had apparently had prior dealings with the Debtor) and Rod Martin, with respect to the Intellectual Property and the newly formed WNS, to solicit their participation in the venture.  Again, Thrasher's efforts in this regard were based in material part on his agreements with the Debtor, such as the ACPI and Consulting Agreement, and the Debtor's continuing representations regarding the availability of investors and software developers in the Philippines.  As a result of these efforts, both Martin and Williams agreed to join the venture.  Both agreed to maintain the confidentiality of the Intellectual Property being developed by Thrasher through agreements, either directly with Thrasher, or with WNS.[3]

13.    Shortly after being retained as a consultant by WNS, Martin was asked to solicit a high reputable group of individuals for service as WNS's Board of Advisors and particularly to serve in WNS's management.

14.    Martin also secured WNS's first outside investors, Eddy and Ellen Layne (the "E. Laynes"), through his relationship with Skinner Layne ("Layne").  As a result, Skinner Layne moved to Dallas to join the WNS team in early December, 2005.  Neither the Debtor, nor Williams, nor Layne ever worked at an internet search company prior to meeting Thrasher and

---

[3]See Exhibit **"D"** and **"E"**.

becoming involved in the WNS project. Moreover, neither the Debtor, nor Williams, nor Layne knew how to write software for an internet search engine prior to this relationship.

15.     In short, everything about WNS was based upon Thrasher and the Debtor's ACPI with respect to the development and exploitation of the Intellectual Property conceived of solely by Thrasher, and the Debtor's representations regarding what he could, would and allegedly was providing to the venture with respect to software development expertise, and contacts and necessary startup capitalization.

16.     To protect both WNS's and his interest in the Intellectual Property (as the Agreement contained reversion provisions), Thrasher sought and obtained either directly, or through WNS, the agreement of the Debtor, Williams, Layne, and the E. Laynes to maintain such Intellectual Property in the strictest of confidences such that it be used only for the purposes of the venture and for none other.

17.     On October 1, 2005, the Debtor was engaged to function as the President of White Nile, via a Consulting Agreement, (*see,* **Exhibit "C"**), the terms of which specifically incorporate the legion of false and fraudulent misrepresentations as to numerous aspects of corporate development, including, but not limited to the role of an alleged "investor" the Debtor assertedly had secured, compounded by further misrepresentations as to the existence, nature, and extent of a "compound on a hill" which was said to house "developers" that the Debtor had assembled as a team in the Philippines. In point of fact, the evidence will show that the "investor" never made any investment in WNS and was apparently unaware of the Debtor's representations to WNS that he had made an investment and would make additional investments in WNS.

18.    Further, the "team" allegedly assembled in the Philippines was said by the Debtor to include "senior guys" who were held out to be "Ph.D.'s". However, the Debtor knew that there was no such development team—there was not even a single programmer. The development team was simply nonexistent, and was part of a fraudulent scheme perpetrated by the Debtor to attempt to gain stock in WNS, which in turn would enable him to gain control of WNS for the purpose of misappropriating Thrasher's Intellectual Property.

19.    The extent of the fraud was discovered by Thrasher and others during a trip he took with Coleman and the Debtor to the Philippines from November 13-20, 2005. During this trip, Thrasher learned that there was no "compound," and no "development team" and no "investor." In fact, although the Debtor had previously represented to Thrasher that there were "at least" twenty (20) PhD programmers already "secretly working on it," in fact, no programmers had been hired, or even interviewed; no work of any kind was being done on behalf of WNS, and no money was ever received from the Debtor's alleged "investor."

20.    Prior to the trip to the Philippines, there had been some discussion as to what trade name would be used in respect to WNS's product. During the trip Coleman conceived of and listed a number of potential trade names. One of the names of which he conceived was "Nexplore". Shortly thereafter, in mid-December 2005, the Debtor, with the assistance of Williams, Layne and others, began a concerted effort to wrongfully gain control of WNS and to misappropriate the Thrasher generated Intellectual Property. The Debtor, with the knowledge and consent of Williams and Layne, began a systematic plan to destroy WNS, to steal its trade secrets and to secure control over the Thrasher generated Intellectual Property. The Debtor, without authority and by use of a fraudulent corporate resolution presented to an FDIC insured financial institution, transferred over $200,000 in cash, approximately 90% of White Nile's

remaining first-round funding, from White Nile's operating account to a separate account accessible only to him.

21.    Also around November 2005, Thrasher and Coleman repeatedly asked the Debtor about his financial contribution to WNS. In response to such inquiries, the Debtor changed the subject and would never respond.

22.    In December, 2005 the Debtor represented to Thrasher and other WNS officers and employees that he had hired Joe Savard as a WNS consultant to be the Chief Technology Officer and among other things to be responsible for overseeing the programing of the back-end of the White Nile internet project. At the Debtor's directions Savard met with Thrasher and Coleman to obtain information and documents relating to the intellectual property/trade secrets involving the internet project that had been invented by Thrasher and further developed (including additional inventive contributions) by Coleman. Actually, the Debtor intended, after obtaining the significant confidential intellectual property/trade secrets of White Nile, that Savard would perform this work for benefit of a separate entity to be formed by the Debtor and others.

23.    In late 2005, the Debtor hired Jeffrey Travis ("Travis") to assist in his fraudulent scheme to misappropriate the Thrasher generated Intellectual Property. This scheme was furthered by the filing of frivolous lawsuits by Travis against Thrasher and Jason Coleman on behalf of WNS.

24.    While the scheme was unfolding in December, the Debtor and Layne reserved a domain name which was also being considered as a trade name for WNS: the domain name was Nexplore. In January 2006, the Debtor, Williams, and Layne (collectively "MWL"), purportedly acting as officers and directors of WNS, executed corporate minutes of WNS releasing

themselves from any obligations under any agreements with or otherwise releasing themselves from any obligations to, WNS.

25.    The next working day after trying to release each other and key consultants of WNS, MWL, on January, 17, 2006, formally incorporated[4] Nexplore Technologies, Inc. ("Nexplore Technologies") to be a software development and internet search engine company[5]. After forming Nexplore, the Debtor informed Savard that Nexplore Technologies was simply a name change for WNS and Mr. Savard could continue work as before.  T/WND asserts that Nexplore Technologies was created for the express purpose of receiving and utilizing the Thrasher generated Intellectual Property, which the Debtor helped misappropriate from Thrasher for the benefit of WNS, and then through WNS misappropriated for the benefit of and by Nexplore.

26.    Under the terms of his ACPI and other agreements which the Debtor had with Thrasher and White Nile, the Debtor was required to disclose the existence of Nexplore Technologies and all of its activities with respect to development of technologies or trade secrets of WNS to WNS and Thrasher "as a work made for hire" and to "execute all documentation necessary" to perfect WNS and Thrasher's rights as against Nexplore.  This obligation survived the Debtor's termination by the explicit language of the Debtor's contract.  Moreover, under the terms of the consulting agreement, the Debtor was not to "disclose such Confidential Information to others *at any time* . . ." including "any and all secrets, proprietary or financial

---

[4]From internet development documents and filings made with the United States Patent Office and other registration entity, it appears that Nexplore Technologies was informally in existence for some time prior to its formal incorporation.

[5]After Nexplore Technologies' subsequent share exchange with N.T. Technologies, Inc. ("NTTI") [effective as of March 30, 2007] Nexplore and NTTI became Nexplore Corporation, one of the intervenors in the removed adversary proceeding.

information, confidential technology, techniques and methodologies, business and customer contact lists, market research and information, technical specifications, data and development plans, and other information or trade secrets of Company." However, rather than disclose any information about Nexplore to WNS and Thrasher, as he was required by contracts and by his duties as an officer and director in WNS, The Debtor hid the fact he was working on a competing entity and used the Thrasher generated Intellectual Property to start and run a competing search engine company: Nexplore.

27.     On or after January 17, 2006, Williams and Layne joined Nexplore Technologies to the extent that they had not already done so.    Williams, on information and belief, was designated at that time as the Chairman of the Board of Nexplore Technologies. Williams has publicly identified Nexplore Technologies as a "Internet/Software Development Search Engine" Company.  Layne was Nexplore Technologies' incorporator and, on information and belief, was its President. The Debtor was CEO of Nexplore Technologies.   At the same time they formed Nexplore Technologies, and continuing throughout much of the ponderance of this litigation, the Debtor, Williams, and Layne held themselves out to be officers and directors of WNS and continued to utilize that corporate form in an attempt to deprive Thrasher of his interest in the Intellectual Property.

28.     Moreover,   Layne, through Travis, an attorney then acting as an intermediary between Thrasher and The Debtor, promised to arrange for the placement of an <u>additional</u> investment of at least $250,000 to White Nile (to be provided by his father, Eddy Layne) as soon as  the $200,000 moved by The Debtor without authority and subsequently frozen by the bank was in an account for White Nile under his (Layne's) control.

29.     However, after Thrasher agreed to the bank's releasing the frozen funds to such an account, Skinner Layne immediately transferred the money to Eddy and Ellen Layne. Within days these funds found their way to Nexplore Technologies, as an investment by Eddy and Ellen Layne. In addition, instead of providing White Nile the second investment of $250,000, on information and belief, a round of investment obtained from investors who saw the White Nile presentation of December 15, 2005 and thought that they were investing in White Nile, Layne placed the promised second round investment into Nexplore Technologies. (See - embedded comment)

30.     On or about February 24, 2006, the Debtor, as CEO, caused WNS to file an Original Petition against Jason Coleman in the 193rd Judicial District Court of Dallas County Texas, cause no. 06-02021 (the "Coleman Petition"). The Coleman Petition alleged a number of causes of action against Coleman, including, breach of contract and sought declaratory relief to determine the rights of the parties under a consulting agreement.

31.     Next, on or about April 5, 2006, The Debtor caused While Nile to  file an Original Petition against Thrasher in the 192nd Judicial District Court of Dallas County, Texas, cause no. 06-03319 (the "WNS Internal Lawsuit"). The WNS Internal Lawsuit alleged a number of causes of action against Thrasher, including breach of fiduciary duties, tortious interference, conversion, civil theft, and sought declaratory relief to determine who owned which amount of shares of WNS. The WNS Internal Lawsuit also included a request for injunctive relief. Thrasher answered and entered into settlement negotiations with the Debtor, Williams and S. Layne in their stated capacities with WNS in the summer and fall of 2006.

*Nexplore*

32.     By this time Thrasher had learned of the existence of Nexplore Technologies. Travis, the Debtor, Williams and S. Layne consistently represented that Nexplore Technologies was not involved in the internet search engine field and was in no way in competition with WNS. In order to settle the WNS Internal Litigation, MWL demanded that Thrasher release any claims against the Debtor, Williams, S. Layne and Nexplore. However, MWL were unwilling to represent in the settlement documents that Nexplore was not involved in the internet search engine field or was not in competition with WNS, a condition, which granting the broad release requires. As a result of this failure, those settlement negotiations were for naught.

33.     After the failed settlement negotiations and certain disqualification motions, Thrasher filed his "Defendant Steven Thrasher's Original Counterclaim and Third Party Petition" in the WNS Internal Litigation, complaining of actions by the Debtor, Skinner Layne, Paul Williams, Eddy Layne and Ellen Layne. Thrasher's counterclaim alleged a number of causes of action both individually and derivatively on behalf of WNS against the Debtor and the other third party defendants. These counterclaims were later amended and by the time of the last pleading filed by Thrasher in state court in the WNS Internal Lawsuit, the TWND claims against the Debtor included, among other things, claims of fraud, breaches of fiduciary duty, theft of trade secrets, conversion, a declaratory judgment to determine who owned which amount of shares of White Nile. Thrasher's counterclaim also included a request that the court impose a constructive trust over all intellectual property owned or controlled by Nexplore, of which the Debtor is the majority owner.

34.     The Debtor, Williams and Layne have been actively attempting to market the Intellectual Property. At least twice in 2006, the Debtor made good on his threat that he could

develop code outside of the jurisdiction of U.S. courts where "no one can touch him" and, while spending at least two weeks in Europe, had attempted to market the trade secrets and to disseminate them by actually hiring at least two developers in the United Kingdom to work for Nexplore Technologies and by recruiting developers in Russia to work for Nexplore Technologies. The Debtor has also recruited Joseph Savard ("Savard") to work for Nexplore Technologies, after Savard had previously been retained to work at White Nile.[6]

35.    Since the filing of the White Nile lawsuit, The Debtor has employed numerous lawyers purportedly on behalf of White Nile, who have been in irreconcilable conflicts of interest and who have either been disqualified or have voluntarily withdrawn.[7]

36.    On or about June 21, 2007, Nexplore filed a petition in intervention in the WNS Internal Lawsuit, as a plaintiff. Nexplore sought a declaratory judgment that it was not using or selling the Intellectual Property of Thrasher, Coleman or WNS. It also sought a declaratory

---

[6] The Debtor also recruited Jeremy Geelan, a purported expert in "AJAX", which is one of the few systems capable of operating the White Nile systems.

[7] On March 2, 2007 Jeffrey Travis withdrew as counsel for White Nile, and Carrington, Coleman, Sloman & Blumenthal ("Carrington, Coleman") substituted in for White Nile. Carrington Coleman also appeared on behalf of the Third Party Defendants, S. Layne, The Debtor, Williams and Eddy and Ellen Layne. Thrasher objected that Carrington, Coleman was conflicted because it was representing parties on opposite sides of the case. On May 15, 2007, Carrington Coleman withdrew as counsel for White Nile. Thereafter, on May 31, 2007, Russell Roden ("Roden") appeared on White Nile's behalf. Thrasher's motion to disqualify Carrington Coleman from continuing to represent the Third-Party Defendants was mooted by the appearance of Dan S. Boyd and the Boyd Law Firm on behalf of *all* of the Third-Party Defendants in September 2007. In addition, Eddy and Ellen Layne contested Dan Boyd's authority to enter into the settlement agreement on their behalf and also asserted that, contrary to the numerous representations to the State Court and the Motion for Withdrawal and Substitution of Counsel that was filed by Boyd and Carrington Coleman on September 27, 2007, Boyd was not and had not ever been retained by Eddy and Ellen Layne to represent them in the State Court. On or about November 12, 2007, Dan Boyd withdrew as counsel for the Third-Party Defendants, and Anderson & Jones, PLLC substituted in for the Third Party Defendants, the Debtor, Skinner Layne and Paul Williams only. On or about December 11, 2007, Jackson & Walker withdrew from representing Nexplore Corporation and the firm of Scheef & Stone, LLP substituted in as counsel for NeXplore Corporation. On or about December 19, 2007 the firm of Gardere Wynne Sewell, LLP substituted in as counsel for Eddy and Ellen Layne. At the beginning of January, 2008, Russell Roden withdrew as counsel for White Nile, and White Nile hired the firm of Abernathy, Roeder, Boyd & Joplin, P.C., which substituted in as counsel for White Nile.

judgment that it may further develop the intellectual property which it currently utilized for itself and third parties. On or about January 3, 2008, NeXplore went live with its website.

37.     On July 7, 2008, the day before a hearing on a motion by Thrasher and Coleman to compel discovery relating to their claims that Nexplore was continuing to use their and/or WNS's Intellectual Property, White Nile sought relief under Chapter 11 of Title 11 in Dallas. Thrasher filed a Motion: i) for Abstention; ii) to Dismiss; or iii) to Appoint Chapter 11 Trustee. Following a hearing on September 2, 2008, Judge Jernigan entered an Order of Abstention, causing the Chapter 11 case to dismissed. On September 17, 2008, new counsel for WNS filed a Second Amended Petition in the White Nile Internal Lawsuit.

38.     Prior to October 22, 2008 certain specific facts of note, including: a) someone directed WNS to file for copyright protection of what are known as the SAQQARA documents (contrary to the Protective Order in the White Nile Internal Lawsuit) ; 2) Paul Williams resigned from WNS and apparently from Nexplore; 3) Skinner Layne resigned from WNS and apparently from Nexplore and moved to Santiago, Chile; and 4) the Debtor appeared to be acting as sole officer and director of WNS, where he apparently hypothecated the WNS intellectual property to secure a loan from a Mr. Barron, the proceeds of which were apparently used to file the dismissed bankruptcy proceeding.

39.     Despite having agreed previously to the entry of two agreed orders appointing the Receiver, in September 2009 the Debtor filed a motion to vacate the appointment. Thereafter, the Debtor sent a letter to the court claiming, among other things, that he did not have and did not foresee having the money to pay the WNS Receiver. That letter, and the Debtor's refusal to pay the Receiver's attorneys' fees, came at the same time that the Debtor

contemporaneously attempted to prosecute his motions for summary judgment in the State Court.

40.     While the White Nile litigation has been proceeding, the United States Patent Office issued on November 25, 2008 Patent No. 1457802 on the Coleman/Thrasher application, which covers back end base search enhancements. The Debtor, as the sole remaining officer and director of WNS, claimed that such patent belongs to WNS instead of Thrasher and Coleman. Yet, as Nexplore's CEO, he had also caused Nexplore to file three interpartes requests for re-examination attacking Patent No. 7457802 with the Patent Office beginning in August, 2009. In an interpartes challenge, the challenging party can present specific challenges to the patent rather than merely calling the Patent Office's attention to the prior art. Nexplore's first two challenges were dismissed for technical reasons. Nexplore's third re-examination request was a 96 page brief that cited 37 prior patents in its attack on the patent. On December 14, 2009, the patent office denied Nexplore's challenge. The patent office determined the patent no. 7457802 was valid and rejected all of Nexplore's arguments against the patent.

41.     On January 25, 2010 (the "Petition Date"), the Debtor commenced his Chapter 11 case by filing a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code. The Debtor thereafter removed the WNS Internal Lawsuit, which is currently pending as an adversary proceeding in this Court.

42.     T/WND, have filed claims in the bankruptcy proceeding. At the current time, the Debtor's objections to those claims are in the process of being tried.

## COUNT ONE

43.     Thrasher incorporates the allegations set forth in paragraphs 3 through 42 above as if fully set forth at length herein. T/WND seek a declaratory judgment that Thrasher

**COMPLAINT**                                                                                    **PAGE 16**

individually is the equitable owner of the Debtor and his bankruptcy estate's shares of stock in WNS and that WNS or Thrasher is the equitable owner of the Debtor and this bankruptcy estate's shares of Nexplore.  While the Debtor's bankruptcy estate holds a legal interest in the shares in WNS and Nexplore, the Debtor's bankruptcy estate is not the equitable owner of such shares as T/WND are beneficiaries of constructive trusts as to such shares in those entities under otherwise applicable Texas law.

44.     In this regard, and as set forth by his actions above described, The Debtor has breached his fiduciary duty to White Nile by:

(1)     directly or in conspiracy with Williams, Layne, E. Layne, and Hughes-Roth entities usurping corporate opportunities with respect to:

(i)     developing, selling, or marketing intellectual property or trade secrets;

(ii)     investors;

(iii)     money raisers (i.e, persons who could locate and persuade others to invest);

(iv)     consultants working on intellectual property;

(v)     hardware and software;

(vi)     domain names (i.e., "Nexplore" and "My Circle"); and/or

(vii)     commercial implementation of the intellectual property or trade secrets;

(2)     individually or in conspiracy with others failing to prosecute WNS's Thrasher generated Intellectual Property, that is, taking the appropriate required

steps in the patent office to continue the rights obtained by the provisional patents that had been filed;

(3)    failing to protect WNS's Intellectual Property from misappropriation by Williams, Layne, the E. Laynes, or Nexplore and its employees, agents or consultants;

(4)    *failing to have WNS issue warrants to Coleman so as to require Coleman to assign ownership of the intellectual property he had developed to White Nile;*

(5)    acting in concert with Williams and Layne in January 2006 to release all officers and employees of WNS from their obligations under nondisclosure agreements with WNS;

(6)    acting with Williams and Layne to release all obligations that each of them had to WNS in January 2006;

(7)    taking the actions referred to in the January 16, 2006 Board of Directors Minutes;

(8)    unilaterially transferring funds from WNS's operation account;

(9)    forming Nexplore with Williams and Layne and becoming a majority owner, director and officer of Nexplore;

(10)   acting with Williams and Layne to return to the E. Laynes approximately $200,000 of the money they had previously invested in White Nile so that Eddy Layne could invest that money in Nexplore;

(11)   individually or in conspiracy with Williams, and Layne, diverting funds in escrow for investment in WNS with Relevant Search Partners, LLC to Nexplore;

(12)   competing with WNS through Nexplore;

(13)   providing access to WNS's intellectual property/trade secrets to third-parties who were not acting for WNS;

(14)   retaining former consultants of WNS, who owed WNS a duty of nondisclosure, to work for Nexplore or in competition with WNS;

(15)   breaching his fiduciary duty of candor to WNS;

(16)   breaching his fiduciary duty of full disclosure by failing to disclose to WNS the formation of Nexplore or what Nexplore did or was planning to do as it related to corporate opportunities of WNS;

(17)   borrowing $60,000 from Lance Barron, a stockholder of Nexplore and securing such loan with WNS's intellectual property;

(18)   attacking the patents at the United States Patent and Trade Office: (i) filing a grievance against the first patent issued by the patent office to Thrasher; or (ii) causing Nexplore to file for a reexamination and subsequently an appeal regarding the patent issued to Thrasher and Coleman;

(19)   directing counsel hired to represent WNS to act contrary to WNS's interests in connection with: (a) the January 16, 2006 WNS board resolution to release certain directors from certain of their obligations to WNS; (b) the generation and execution of corporate documents of WNS; (c) the decision to return Eddy Layne's investment in WNS and steps taken to effect that decision; (d) WNS's interest in and the value of the Intellectual Property alleged in the WNS Internal Lawsuit against Steve Thrasher or Jason Coleman; (e) the decision not to file utility patents which related back to the WNS provisional patent applications filed by Thrasher in 2005; (f) potential claims of WNS against Nexplore, the

Debtor, Williams or Skinner Layne or Eddy Layne or any entity owned or controlled by them; (g) Thrasher's request for appointment of Receiver; (h) the October 17, 2007 and October 19, 2007 court proceeding in the WNS litigation; (i) Thrasher's request for appointment of a Receiver; (j) the decision to have WNS file for bankruptcy protection; (k) the Lance Barron security interest in certain WNS's intellectual property; or (l) copyright filings in the name of WNS;

(21)   failing to provide full disclosure with respect to the competition being provided by Nexplore;

(22)   disclosing or disseminating WNS's intellectual property;

(23)   lack of candor to WNS;

45.   The Debtor's breaches of fiduciary duties to WNS by the Debtor, resulted in injury to WNS and unjustly enriched the Debtor.   Specifically, the Debtor utilized his breaches of his fiduciary duties to WNS to obtain his shares of stock in Nexplore and to obtain his salary, bonuses and other benefits from Nexplore.

46.   As set forth by his actions above described, the Debtor breached his fiduciary duties owed to Thrasher as a result of the joint venture between the two of them, specifically the Debtor's duties: a) of loyalty to the joint enterprise; b) of utmost good faith, fairness, and honesty in dealing with Thrasher on matters pertaining to the enterprise; c) of full disclosure of all matters affecting the joint venture; d) to account for all partnership rights and property; and e) to refrain from competing with the venture.   More specifically, the Debtor breached these duties by, among other actions:

(1)      directly or in conspiracy with Williams, Layne, the E. Laynes, and the Hughes-Roth entities usurping joint venture opportunities with respect

to;

     (i)     developing, selling, or marketing intellectual property or trade secrets;

     (ii)     investors;

     (iii)     money raisers (i.e, persons who could locate and persuade others to invest);

     (iv)     consultants working on intellectual property;

     (v)     hardware and software;

     (vi)     domain names (i.e., Nexplore); or

     (vii)     commercial implementation of the intellectual property or trade secrets.

(2)     failing to prosecute the patent rights, that is taking the appropriate required steps in the patent office to continue the rights obtained by the provisional patents that have evolved;

(3)     failing to protest Thrasher's and Thrasher and Coleman's intellectual property from misappropriation by Williams, Layne, The E. Laynes, and Nexplore

(4)     by disclosing Thrasher's and Thrasher and Coleman's intellectual property to Nexplore;

(5)     failing to have White Nile issue was to Coleman was to require Coleman to assign the intellectual property he had developed White Nile;

(6)     acting in concert with Williams and Layne to release all officers and employees of White Nile from their obligations under non-disclosure agreements with White Nile;

(7)     acting with Williams and Layne to release all obligations that each of them had to White Nile in January 2007;

(8)     acting with Williams and Layne to return to E. Laynes approximately $200,000.00 of the money they had previously invested in White Nile;

(9)     individually, or in conspiracy with Williams, and Layne, by diverting funds in escrow for investment in WNS with Relevant Search Partners LLC to Nexplore;

(10)    by forming Nexplore with Williams and Layne and becoming a majority owner, director and officer of Nexplore;

(11)    by competing with Thrasher or WNS through Nexplore;

(12)    by providing access to Thrasher's or WNS's intellectual property/trade secrets to third parties who were not acting for WNS;

(13)    breaching his fiduciary duties of candor to Thrasher;

(14)    failing to disclose to Thrasher the formation of Nexplore;

(15)    filing a bankruptcy petition for WNS;

(16)    borrowing $60,000.00 from Lance Burton, a shareholder in Nexplore, to file a bankruptcy petition for WNS and securing such loan with WNS's intellectual property;

**COMPLAINT**
H:\Clients\Thrasher\White Nile\Mandel Bankruptcy\Adversary--Constructive trust\541 complaint 1-12-11 morning draft.wpd

PAGE 22

(17)    filing a grievance against the first patent issued by the patent officer to Thrasher or by causing Nexplore to file for reexamination or subsequently an appeal against the second patent to be issued against Thrasher;

(18)    attacking the patents at the United States Patent and Trade Office: (i) filing a grievance against the first patent issued by the patent office to Thrasher; or (ii) causing Nexplore to file for a reexamination and subsequently an appeal regarding the patent issued to Thrasher and Coleman;

(19)    by disclosing or disseminating Thrasher's intellectual property;

(20)    by failing to provide full disclosure to Thrasher with respect to the competition being provided by Nexplore; and

(21)    by lack of candor to Thrasher

47.    As a result of these breaches of fiduciary duty, the Debtor cause injury to Thrasher and obtained unjust benefits to himself, specifically acquiring Shares of stock in WNS and in Nexplore.

48.    The Debtor committed fraud against Thrasher in the following respects:

(1)    by representing to Thrasher at the time that they entered into the joint venture agreement that he held a certain level of pertinent expertise relevant to the internet project such as holding an EE degree, being an expert in database structure, having invented products that were recognized as products of year and having connection with the "angel" investment community.  These representations were false and the Debtor knew at the

time he made them that they were false or made the representations recklessly as a positive assertion without knowledge of their truth.

(2)    by falsely promising to Thrasher at the time they entered into the joint venture that he would contribute $300,000.00 in funds to the development of the internet project when he had a current intent not to fulfill that promise

49.    Both of these representations were made with the intent that Thrasher would act upon them. Thrasher did reasonably rely upon the representations, which resulted in his injury and in the Debtor receiving unjust benefits, specifically 50% interest in the joint venture with Thrasher, and subsequently the stock issued to the Debtor in WNS and thereafter by Nexplore.

50.    The Debtor committed fraud against WNS by representing to WNS in the fall of 2005:

(1)    that he had obtained an investor in the Philippines who had placed $2,000,000.00 in escrow to capitalize WNS's development of the internet project invented by Thrasher; and

(2)    that there was a team of at least twenty experienced, highly qualified programmer/developers, assembled in the Philippines, including persons with Ph.D.'s, already working on programs to develop the back-end of the internet project for WNS.

51.    These representations were false, and the Debtor made these representations knowing that they were false or he made them recklessly without knowledge of their truth and as a positive assertion. He made these representations with the intention that WNS would rely upon

them, and WNS did reasonably rely upon those representations resulting in injury to WNS and benefitting the Debtor by avoiding his obligations to WNS.

52.     In December 2005 the Debtor represented to Thrasher and other representatives of WNS that he had retained Joe Savard for the purpose of developing the back-end of the internet project for WNS.  The representation was false in that the Debtor intended that Savard's work would be for the benefit of the new entity of Nexplore. The Debtor intended that Thrasher and WNS would act upon these representations.  Thrasher and WNS reasonably relied upon the Debtor's representations and disclosed confidential intellectual property/trade secrets regarding the internet project to Joe Savard resulting in injury to Thrasher and WNS and unjustly benefitting the Debtor by allowing him to form, with Williams and Layne, Nexplore and utilize White Nile/Thrasher's intellectual property/trade secrets to advance Nexplore's and his own interests.

53.     As a result of the foregoing fraudulent acts against Thrasher and WNS, the Debtor was able to obtain his stock in Nexplore.

54.     Moreover, the Debtor's actions as set forth above, show that the Debtor has engaged in actual fraud as to Thrasher and/or WNS.  In this regard, and as set forth above, the Debtor has made material representations which were false, either knowing that they were false or he made them recklessly without any knowledge of their truth and as a positive assertion.  The Debtor made said representations with the intent that Thrasher and/or WNS rely on same, and Thrasher and/or WNS so relied and thereby suffered injury.

55.     In addition, The Debtor committed other wrongful acts against Thrasher and WNS in committing civil theft, converting and misappropriating their intellectual property, which

qualified as trade secrets under Texas Law by which wrongful actions the Debtor has been unjustly enriched.

56.    The Debtor, individually or in conspiracy with Williams, Layne and E. Laynes stole and disclosed trade secrets belonging to Thrasher, Thrasher and Coleman and/or WNS to Nexplore and/or its agents and employees.  The Debtor used or caused Nexplore to use trade secrets belonging to Thrasher, Thrasher and Coleman, and /or WNS.  The Debtor also facilitated or allowed other WNS consultants to disclose or use trade secrets belonging to Thrasher, and/or Coleman, and/or WNS.  Such uses or disclosures by the Debtor and others at his direction or control came after acquiring the trade secrets by improper means, such as conduct that falls below the general accepted standards of commercial morality and reasonable conduct.  The use of these trade secrets by Nexplore occurred after it knew or reasonably should have known that the disclosure of the trade secrets by the Debtor constitutes a breach of his duties to Thrasher and to WNS not to improperly acquire, discover or, disclose the trade secrets.  The Debtor's conduct was also a civil theft in that without the effective consent of the owners, Thrasher and Coleman, and/or WNS, he made copies of articles representing the trade secrets and communicated or transmitted the trade secrets to Nexplore.  The Debtor's conduct in such regard was the basis for the foundation of Nexplore and unjustly resulted in his obtaining stock in Nexplore and is position as C.E.O. and is a director of Nexplore, and allowed him to become unjustly enriched in such respect.

57.    A constructive trust on the Debtor's shares in Nexplore is the only remedy that will adequately compensate Thrasher and/or White Nile and prevent the unjust enrichment of the Debtor at their expense.

58.    It is unconscionable for the Debtor or his bankruptcy estate to retain the shares issued to him by WNS and the shares issued to him by Nexplore.  A constructive trust on the property in question is the only remedy that will adequately compensate Thrasher and/or WNS and prevent the unjust enrichment of the Debtor at the T/WND's expense.

59.    As alleged above, the Debtor has either engaged in breaches of fiduciary duties as to Thrasher and/or WNS and/or he has committed actual fraud and/or committed other unconscionable acts against each.  As a result of this conduct, the Debtor has been unjustly enriched, which benefits can be traced to an identifiable res, that is, the of shares issued to him by WNS and/or Nexplore.  As such, a constructive trust should be imposed on said shares.

60.    Section 541(d) of the Bankruptcy Code accords the beneficiary of a constructive trust properly imposed under state law, such as Thrasher and/or WNS, the right to recover property under such a trust from the debtor.  Accordingly, the property of the estate assertions made by The Debtor are limited  by §541(d) and  creates an actual justiciable controversy.

61.    Pursuant to 28 U.S. C § 2201 and Rule 7001, T/WND seeks the entry of a judgment declaring that the Debtor's shares in WNS and in Nexplore are held in legal title only, are not property of the bankruptcy estate, and that the equitable interest in the such assets are held by T/WND in accordance with §541(d).

**WHEREFORE,** Steven Thrasher, both individually and derivatively on behalf of White Nile Software, Inc. prays that the after trial, the Court enter the following:

1)    a judgment decreeing in accordance with §541(d) and applicable case law construing same, that a constructive trust should be imposed over the Shares of stock held by Debtor in White Nile Software, Inc., that the Debtor and the

Debtor's Estate hold the legal title only in said shares, that said shares are not property of the Estate and that the equitable interest in such Shares is held by Thrasher and/or WNS, and that the Debtor is the constrictive trustee for the benefit of Steven Thrasher and White Nile Software, Inc.;

2)    a judgment decreeing in accordance with §541(d) a constructive trust over the shares of stock held by Debtor in Nexplore Corporation, that the Debtor and the Debtor's Estate hold the legal title only in said shares, that said shares are not property of the Estate and that the equitable interest in such shares are held by Thrasher and/or White Nile, and that the Debtor is the constrictive trustee for the benefit of  Steven Thrasher and White Nile Software, Inc.

3)    a judgment ordering the Debtor as constructive trustee, to convey the shares of WNS held by the Debtor to Steven Thrasher and/or WNS.

4)    a judgment ordering the Debtor, as constructive trustee, to convey to Steven Thrasher and/or WNS, all of the Shares of Nexplore Corporation stock held by the Debtor.

5)    Such other relief as to which the T/WND may be justly entitled.

Respectfully submitted by,

THE LAW OFFICES OF MITCHELL MADDEN
1755 Wittington Place, Suite 300
Dallas, Texas 75234
Telephone: (972) 484-7780
Facsimile:  (972) 484-7743
Email: skinney@maddensewell.com

By:     /s/ Mitchell Madden_____
Mitchell Madden
State Bar No. 12789350

**ATTORNEYS FOR STEVEN
THRASHER, individually and
derivatively on behalf of WHITE NILE
SOFTWARE, INC.**